Slip Op. 17-60

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| SIGVARIS, INC., | |
| **Plaintiff,** | |
| v. | **Before: Jennifer Choe-Groves, Judge** |
| UNITED STATES, | **Court No. 11-00532** |
| **Defendant.** | |

## <u>OPINION</u>

[Denying Plaintiff's motion for summary judgment and granting Defendant's cross-motion for summary judgment with respect to the classification of certain models of graduated compression hosiery; Granting Plaintiff's motion for summary judgment and denying Defendant's cross-motion for summary judgment with respect to the classification of certain models of graduated compression arm-sleeves and gauntlets.]

Dated: May 17, 2017

<u>John M. Peterson</u>, <u>Russell A. Semmel</u>, and <u>Elyssa R. Emsellem</u>, Neville Peterson, LLP, of New York, NY, argued for Plaintiff Sigvaris, Inc.

<u>Alexander J. Vanderweide</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for Defendant United States.  With him on the brief were <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, and <u>Amy M. Rubin</u>, Assistant Director.  Of counsel on the brief was <u>Beth C. Brotman</u>, Attorney, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, of New York, NY.

Choe-Groves, Judge:  This case addresses whether various models of graduated

compression hosiery, arm-sleeves, and gauntlets (fingerless, glove-like articles worn on the

hands) are specially designed for the use or benefit of handicapped persons and are therefore

duty-free under the Nairobi Protocol to the Florence Agreement on the Importation of

Educational, Scientific, and Cultural Materials ("Nairobi Protocol") and the Harmonized Tariff

Schedule of the United States ("HTSUS").[1]  Before the court are cross-motions for summary

judgment.  See Pl.'s Mot. Summ. J., Dec. 21, 2015, ECF No. 56; Mem. Sigvaris, Inc., Supp. Pl.'s

Mot. Summ. J., Dec. 21, 2015, ECF No. 56-2 ("Pl. Br."); Def.'s Cross-Mot. Summ. J. 1–2, Mar.

10, 2016, ECF No. 61; Def.'s Mem. Supp. Cross-Mot. Summ. J. 20–46, Mar. 10, 2016, ECF No.

61 ("Def. Br.").

        Sigvaris, Inc. ("Plaintiff") argues that U.S. Customs and Border Protection ("Customs")

improperly denied its protests that challenged the classification of its imported graduated

compression merchandise.  See Pl. Br. 1.  Plaintiff contends that all of its compression products

are entitled to duty free treatment because the products are classifiable under the Nairobi

Protocol and HTSUS subheading 9817.00.96, which covers "[a]rticles specially designed or

adapted for the use or benefit of the blind or other physically or mentally handicapped persons."[2]

See Pl. Br. 3–21.  The United States ("Defendant" or "Government") maintains that Customs

properly classified the imported graduated compression merchandise as not specially designed

for handicapped persons.  See Def. Br. 5–21.

        For the reasons discussed below, the court (1) denies Plaintiff's motion for summary

judgment and grants Defendant's cross-motion for summary judgment with respect to the

classification of the models of hosiery at issue, which were properly classified by Customs under

[1] All citations to the HTSUS are to the 2008–2010 versions based on the dates of the entries at
issue.  The relevant provisions and accompanying notes from these versions are identical.

[2] On February 28, 2017, the court issued an opinion sua sponte dismissing classification claims
brought by Plaintiff regarding certain models of graduated compression products.  See Sigvaris,
Inc. v. United States, 41 CIT __, 211 F. Supp. 3d 1353, 1358–64 (2017).  The court now issues
this opinion to address the merits of the Parties' cross-motions for summary judgment and to rule
on the classification claims concerning the imported merchandise, excluding the claims
dismissed in the court's previous opinion.

HTSUS subheading 6115.10.40 as "[o]ther graduated compression hosiery: . . . [o]f synthetic

fibers"; and (2) grants Plaintiff's motion for summary judgment and denies Defendant's cross-

motion for summary judgment with respect to the classification of the models of arm-sleeves and

gauntlets at issue, which are classifiable under the Nairobi Protocol and HTSUS subheading

9817.00.96 as articles specially designed for the use or benefit of physically handicapped

persons.

## UNDISPUTED FACTS

As required by USCIT Rule 56.3, Plaintiff and Defendant submitted separate statements

of material facts and responses thereto.  See Statement of Material Facts as to Which no Genuine

Issue Exists, Dec. 21, 2015, ECF No. 56-1 ("Pl. Facts"); Def.'s Resp. Pl.'s Statement of Material

Facts as to Which no Genuine Issues Exists, Mar. 10, 2016, ECF No. 61 ("Def. Facts Resp.");

Def.'s Statement of Undisputed Material Facts, Mar. 10, 2016, ECF No. 61 ("Def. Facts"); Pl.'s

Resp. Def.'s Statement of Undisputed Material Facts, June 1, 2016, ECF No. 66-1 ("Pl. Facts

Resp.").  The following facts are not in dispute.

### A.  Jurisdictional and Procedural Facts

Plaintiff imported 105 entries of graduated compression merchandise into the United

States at the Port of Atlanta in Georgia between September 2008 and November 2010.  See Pl.

Facts ¶¶ 1–2; Def. Facts Resp. ¶¶ 1–2.  The entries were liquidated by Customs between August

2009 and September 2011.  See Pl. Facts ¶ 3; Def. Facts Resp. ¶ 3.  Customs classified the

graduated compression merchandise under various provisions of the HTSUS as follows: (1) the

hosiery at a duty rate of 14.6% *ad valorem* under HTSUS subheading 6115.10.40 as "Other

graduated compression hosiery: . . . Of synthetic fibers" or duty free under HTSUS subheading

6115.10.05 as "Graduated compression hosiery (for example, stockings for varicose veins):

Surgical panty home [sic] and surgical stockings with graduated compression for orthopedic

treatment"; (2) the arm-sleeves under HTSUS subheading 6307.90.98 as "Other made up

articles, including dress patterns: . . . Other: . . . Other" dutiable at 7% *ad valorem*; and (3) the

gauntlets under HTSUS subheading 6116.93.88 as "Gloves, mittens and mitts, knitted or

crocheted: . . . Other: . . . Of synthetic fibers: . . . Other: Without fourchettes" dutiable at 18.6%

*ad valorem*.  See Pl. Facts ¶ 3; Def. Facts Resp. ¶ 3; see also Summons, Dec. 22, 2011, ECF

No. 1.

Plaintiff filed timely protests contesting the classification of several models of

compression products and seeking duty free treatment of its merchandise.  See Protest Nos.

1704-10-100013, -10-100018, -10-100068, -10-100240, -10-100258, -11-100057, -11-100189,

-11-100352, -11-100414.  All nine of Plaintiff's protests were deemed denied by Customs on

December 12, 2011.[3]  See Summons; Compl. ¶ 4, Mar. 30, 2012, ECF No. 6.  Plaintiff paid

liquidated duties according to Customs' classification of the merchandise.  See Pl. Facts ¶ 4; Def.

Facts Resp. ¶ 4.  Thereafter, Plaintiff commenced this action.  See Summons.

**B.  Facts Regarding the Imported Compression Products**

The imported merchandise consists of various models of graduated compression

products, each differing in style, material, length, and compression level.  See Def. Facts ¶¶ 1–8;

---

[3] The time in which Customs was given by statute to either allow or deny Plaintiff's protests elapsed, and, as a result, the protests were deemed denied by Customs on December 12, 2011. See 19 U.S.C. § 1515(b) (2006) ("For purposes of section 1581 of Title 28, a protest which has not been allowed or denied in whole or in part within thirty days following the date of mailing by certified or registered mail of a request for accelerated disposition shall be deemed denied on the thirtieth day following mailing of such request."); see also 19 C.F.R. § 174.22 (2011).

Pl. Facts Resp. ¶¶ 1–8.  Each model is designed to apply a fixed range of graduated compression measured in millimeters of mercury ("mmHg").  See Def. Facts ¶ 3–4; Pl. Facts Resp. ¶ 3–4. Graduated compression applies maximum pressure at the furthest point in the extremity and decreases gradually up the limb.  See Pl. Facts ¶ 6; Def. Facts Resp. ¶ 6; Def. Facts ¶¶ 3–4; Pl. Facts Resp. ¶¶ 3–4.  The compression products "are made on special circular knitting machines that use elasticized material to impart compression characteristics . . . [,] to ensure the product is made for the proper measurements and to exert the correct pressure."  Pl. Facts ¶ 7; Def. Facts Resp. ¶ 7.

The imported graduated compression hosiery consists of products from three product lines – the 120 Support Therapy Sheer Fashion Series for women ("Series 120"), the 145 Support Therapy Classic Dress Series for women ("Series 145"), and the 185 Support Therapy Classic Dress Series for men ("Series 185").  See Def. Facts ¶ 2; Pl. Facts Resp. ¶ 2; Pl. Facts ¶ 5; Def. Facts Resp. ¶ 5.  Series 120 hosiery is available in a variety of models, including 120P (pantyhose), 120M (maternity pantyhose), 120N (thigh-high hosiery), 120C (calf-length hosiery), and 120CO (calf-length hosiery with open toe).  See Def. Facts ¶ 5; Pl. Facts Resp. ¶ 5. Series 120 models are "made of a combination of nylon and spandex, and in some products, also silicone."  Def. Facts ¶ 6; Pl. Facts Resp. ¶ 6.  Series 145 and Series 185 models of compression hosiery "are calf-length graduated support dress socks made of a combination of nylon and spandex."  Def. Facts ¶ 7; Pl. Facts Resp. ¶ 7.  All of the hosiery models at issue from these product lines exert 15–20 mmHg of compression.  See Def. Facts ¶¶ 6–7; Pl. Facts Resp. ¶¶ 6–7; see also Pl. Exs. Rule 56.3 Statement of Facts and Mem. Ex. A at 000029–30, 000035, Dec. 21, 2015, ECF No. 56-4 ("Ex. A").  The compression applied by the hosiery is greatest at the ankle

and gradually decreases as the stocking moves up the leg.[4]  See Pl. Facts ¶ 6; Def. Facts Resp.

¶ 6; Def. Facts ¶ 3; Pl. Facts Resp. ¶ 3.

   The imported graduated compression arm-sleeves and gauntlets are part of the 500

Medical Therapy Natural Rubber Series ("Series 500").  See Def. Facts ¶ 8; Pl. Facts Resp. ¶ 8.

Series 500 arm-sleeves and gauntlets are available in the following models: 503A (arm-sleeve

without gauntlet), 503B (arm-sleeve with gauntlet), and 503Gs2 and 503GM2 (separate

gauntlets).  See Def. Facts ¶ 8; Pl. Facts Resp. ¶ 8.  These arm-sleeves and gauntlets "are made

of a combination of nylon and natural latex rubber."  Def. Facts ¶ 8; Pl. Facts Resp. ¶ 8.  The

arm-sleeves and gauntlets apply 30–40 mmHg of compression, which is greatest at the wrist and,

in the case of the arm-sleeves, decreases gradually as the sleeve moves up the arm.  See Pl. Facts

¶¶ 1, 6; Def. Facts Resp. ¶¶ 1, 6; Def. Facts ¶ 8; Pl. Facts Resp. ¶ 8.

## C.  Facts Regarding Chronic Venous Disease, Chronic Venous Insufficiency, and Lymphedema

   Chronic venous disease ("CVD") "is a mechanical problem of the lower limbs in which

the walls of veins and valves are, to relative degrees of severity, damaged, obstructed, [or]

leaking."  Def. Facts ¶ 9; Pl. Facts Resp. ¶ 9.  The severity of CVD is graded according to the

Clinical, Etiology, Anatomy, Pathophysiology ("CEAP") scale where no clinical signs of CVD

are classified under C0, small varicose veins are classified under C1, large varicose veins are

classified under C2, edema is classified under C3, skin change with no ulceration is classified

under C5, and skin change with an active ulceration is classified under C6.  See Def. Facts ¶ 11;

---

[4] For example, full-length graduated compression hosiery would have "100% compression at the ankle, 50–80% compression at the calf, and 20–40% compression at the thigh."  Def. Facts ¶ 3; Pl. Facts Resp. ¶ 3.

Pl. Facts Resp. ¶ 11.  A quarter of adult Americans have varicose veins, many of whom do not

suffer from any discomfort or other symptoms of CVD.  See Def. Facts ¶ 20; Pl. Facts Resp.

¶ 20.  "The symptoms of CVD can be managed by graduated compression therapy, or in the case

of superficial and varicose veins, treated surgically, but the underlying conditions giving rise to

CVD cannot be fixed or cured."  Def. Facts ¶ 10; Pl. Facts Resp. ¶ 10.  Chronic venous

insufficiency ("CVI") "is a subset of CVD of greater severity, which affects people with C3 or

C4 to C6 conditions."  Def. Facts ¶ 12; Pl. Facts Resp. ¶ 12.  CVI is "a condition in which the

valves in varicose arteries and veins no longer work properly to assist in pumping blood back to

the heart, with the result that gravity directs blood and other fluids downward, causing painful

swelling of the extremity."  Pl. Facts ¶ 12; Def. Facts Resp. ¶ 12.  Severe cases of CVI can

interfere with and impair certain life functions, such as walking, standing, and working.  See Pl.

Facts ¶ 20; Def. Facts Resp. ¶ 20.

Lymphedema is "a chronic and incurable condition in which the patient's lymphatic

system does not function efficiently to recirculate lymph out of the extremities."  Pl. Facts ¶ 14;

Def. Facts Resp. ¶ 14.  An improperly functioning lymphatic system causes lymphatic fluid and

water to pool in the extremities, causing pain, swelling, sluggishness, and skin ulcerations.  See

Pl. Facts ¶¶ 14, 23; Def. Facts Resp. ¶¶ 14, 23; see also Def. Facts ¶ 21; Pl. Facts Resp. ¶ 21.

Lymphedema can interfere with and impair certain life functions.  See Pl. Facts ¶ 20; Def. Facts

Resp. ¶ 20.  Women who have had their lymph nodes damaged or surgically removed during a

mastectomy to treat breast cancer suffer from upper-limb lymphedema.  See Def. Facts ¶ 21; Pl.

Facts Resp. ¶ 21; see also Pl. Facts ¶ 23; Def. Facts Resp. ¶ 23. Mastectomy patients "with

improperly functioning lymphatic systems suffer from extremely swollen limbs due to retained

lymphatic fluid."  See Pl. Facts ¶ 23; Def. Facts Resp. ¶ 23.  People who suffer from upper-limb

lymphedema may be unable, in some cases, to use the affected arm because of significant

swelling.  See Def. Facts ¶ 23; Pl. Facts Resp. ¶ 23.

If left untreated, CVI and lymphedema may cause lesions, ulcers, bleeding, and infection

as the limb swells and the skin stretches to accommodate the swelling.  Pl. Facts ¶ 19; Def. Facts

Resp. ¶ 19.

### D.  Facts Regarding the Design and Use of the Imported Compression Products

The use of graduated compression can help manage and alleviate the symptoms of CVD

and lymphedema.  See Pl. Facts ¶¶ 12, 14; Def. Facts Resp. ¶¶ 12, 14.  "Graduated compression

forces blood and fluids (water, lymph) that have pooled in the extremity due to malfunctioning or

damaged venous valves or lymphatic systems to circulate out of the extremity."  Pl. Facts ¶ 11;

Def. Facts Resp. ¶ 11.  "Forcing blood and other fluids upward, out of the extremity, prevents

venous reflux or pooling, which causes . . . varicose veins, edema, and skin ulcerations."  Pl.

Facts ¶ 13; Def. Facts Resp. ¶ 13.

The imported models of graduated compression hosiery impart levels of compression that

can alleviate CVD symptoms.  See Pl. Facts ¶ 21; Def. Facts Resp. ¶ 21.  The compression

hosiery products can be prescribed by a physician, but generally are neither covered by insurance

nor provided to patients in hospitals.  See Def. Facts ¶ 18; Pl. Facts Resp. ¶ 18.  The hosiery can

also be purchased over-the-counter without a prescription at durable medical supply companies,

pharmacies, and over the internet.  See Def. Facts ¶ 18; Pl. Facts Resp. ¶ 18.  The compression

hosiery is designed to be worn every day, except while sleeping.  See Def. Facts ¶ 13; Pl. Facts

Resp. ¶ 13.  The compression hosiery does not cure CVD or lymphedema.  See Pl. Facts ¶ 24;

Def. Facts Resp. ¶ 24.  The hosiery products "are not designed or intended for use as surgical compression or anti-embolism stockings following an orthopedic procedure."[5]  Def. Facts ¶ 25; Pl. Facts Resp. ¶ 25.

The imported models of graduated compression arm-sleeves and gauntlets can alleviate the symptoms of upper-limb lymphedema.  See Pl. Facts ¶ 21; Def. Facts Resp. ¶ 21.  The compression arm-sleeves and gauntlets are "predominantly worn" by women who suffer from upper-limb lymphedema, which has been caused by damaged or surgically-removed lymph nodes during a mastectomy to treat breast cancer.  See Def. Facts ¶ 21; Pl. Facts Resp. ¶ 21; see also Pl. Facts ¶ 23; Def. Facts Resp. ¶ 23.  The arm-sleeves reduce swelling in the arm and the gauntlets reduce swelling in the hand.  See Def. Facts ¶ 21; Pl. Facts Resp. ¶ 21.  The arm-sleeves and gauntlets are prescribed as a preventative measure for people who are expected to suffer from upper-limb lymphedema or as treatment for people who already suffer from upper-limb lymphedema.  See Def. Facts ¶ 22; Pl. Facts Resp. ¶ 22; Pl. Facts ¶¶ 8, 17; Def. Facts Resp. ¶¶ 8, 17.  They can also be prescribed for temporary use by patients undergoing surgery for other conditions that cause swelling.  See Def. Facts ¶ 22; Pl. Facts Resp. ¶ 22.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (2006)[6] and 19 U.S.C. § 1515 (2006).  The court will grant summary judgment if "the movant shows that there is no genuine

---

[5] "Surgical compression stockings, also known as anti-embolism stockings, are prescribed following an orthopedic surgical procedure to reduce swelling and the risk of clots and deep-vein thrombosis.  Such stockings are designed to provide compression at the calf, and are worn by post-operative patients who are bed-ridden."  Def. Facts ¶ 24; Pl. Facts Resp. ¶ 24.

[6] Further citations to Title 28 of the U.S. Code are to the 2006 edition.

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

USCIT R. 56(a).  To raise a genuine issue of material fact, a party cannot rest upon mere

allegations or denials and must point to sufficient supporting evidence for the claimed factual

dispute to require resolution of the differing versions of the truth at trial.  See Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986); Processed Plastics Co. v. United States, 473

F.3d 1164, 1170 (Fed. Cir. 2006); Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.,

731 F.2d 831, 835–36 (Fed. Cir. 1984).

     A two-step process guides the court in determining the correct classification of

merchandise.  First, the court ascertains the proper meaning of the terms in the tariff provision.

See Schlumberger Tech. Corp. v. United States, 845 F.3d 1158, 1162 (Fed. Cir. 2017) (citing

Sigma-Tau HealthScience, Inc. v. United States, 838 F.3d 1272, 1276 (Fed. Cir. 2016)).  Second,

the court determines whether the merchandise at issue falls within the parameters of the tariff

provision.  See id.  The former is a question of law and the latter is a question of fact.  See id.

"[W]hen there is no dispute as to the nature of the merchandise, then the two-step classification

analysis 'collapses entirely into a question of law.'"  Link Snacks, Inc. v. United States, 742 F.3d

962, 965–66 (Fed. Cir. 2014) (quoting Cummins Inc. v. United States, 454 F.3d 1361, 1363 (Fed.

Cir. 2006)).

     The court reviews classification cases de novo.  See 28 U.S.C. § 2640(a)(1).  Customs is

afforded a statutory presumption of correctness in classifying merchandise under the HTSUS,

see 28 U.S.C. § 2639(a)(1), but this presumption does not apply to pure questions of law.  See

Universal Elecs. Inc. v. United States, 112 F.3d 488, 492 (Fed. Cir. 1997).  The court has "an

independent responsibility to decide the legal issue of the proper meaning and scope of HTSUS

terms," Warner-Lambert Co. v. United States, 407 F.3d 1207, 1209 (Fed. Cir. 2005) (citing

Rocknel Fastener, Inc. v. United States, 267 F.3d 1354, 1358 (Fed. Cir. 2001)), and therefore

must determine "whether the government's classification is correct, both independently and in

comparison with the importer's alternative." Jarvis Clark Co. v. United States, 733 F.2d 873,

878 (Fed. Cir. 1984).

## DISCUSSION

### I.   Legal Framework

The classification of merchandise under the HTSUS is governed by the General Rules of

Interpretation ("GRIs") and, if applicable, the Additional U.S. Rules of Interpretation, which are

both applied in numerical order. BenQ Am. Corp. v. United States 646 F.3d 1371, 1376 (Fed.

Cir. 2011) (citing N. Am. Processing Co. v. United States, 236 F.3d 695, 698 (Fed. Cir. 2001)).

GRI 1 instructs that, "for legal purposes, classification shall be determined according to the terms

of the headings and any [relevant] section or chapter notes." GRI 1. "Absent contrary legislative

intent, HTSUS terms are to be 'construed [according] to their common and popular meaning.'"

Baxter Healthcare Corp. of P.R. v. United States, 182 F.3d 1333, 1337 (Fed. Cir. 1999) (quoting

Marubeni Am. Corp. v. United States, 35 F.3d 530, 533 (Fed. Cir. 1994)).

In construing the terms of the headings, "[a] court may rely upon its own understanding

of the terms used and may consult lexicographic and scientific authorities, dictionaries, and other

reliable information sources." Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir.

1999) (citing Baxter Healthcare Corp. of P.R., 182 F.3d at 1337). The court may also consult the

Harmonized Commodity Description and Coding System's Explanatory Notes ("Explanatory

Notes"), which "provide a commentary on the scope of each heading of the Harmonized System

. . . and are generally indicative of proper interpretation of the various provisions." H.R. Rep.

No. 100–576, 549 (1988), reprinted in 1988 U.S.C.C.A.N. 1547, 1582; see also E.T. Horn Co. v.

United States, 367 F.3d 1326, 1329 (Fed. Cir. 2004) (citing Len-Ron Mfg. Co. v. United States,

334 F.3d 1304, 1309 (Fed. Cir. 2003)).  Tariff terms are defined according to the language of the

headings, the relevant section and chapter notes, the Explanatory Notes, available lexicographic

sources, and other reliable sources of information.

Plaintiff contends that all of its compression products are classifiable as duty free under

the Nairobi Protocol as articles specially designed for the use or benefit of physically

handicapped persons.  See Pl. Br. 3–21.  Defendant contends that Customs correctly classified

Plaintiff's compression products as ordinary articles not intended for handicapped persons under

HTSUS subheadings 6115.10.40, 6307.90.98, and 6116.93.88.  See Def. Br. 5–21.  The central

issue presented by the cross-motions for summary judgment is whether Plaintiff's compression

products meet the requirements for duty free treatment under the Nairobi Protocol as

implemented by HTSUS subheading 9817.00.96.[7]

---

[7] The tariff provisions in Chapters 1 through 97 of the HTSUS generally reflect the international
nomenclature of the Harmonized Commodity Description and Coding System as developed by
the World Customs Organization.  Chapters 98 and 99 contain classification provisions in
addition to the international nomenclature that implement special duty treatment afforded by the
U.S. government pursuant to temporary legislation or trade agreements.  The tariff provisions in
Chapter 98 of the HTSUS are not subject to the rule of specificity as provided in GRI 3(a).  See
U.S. Note 1, Chapter 98 HTSUS.  Merchandise must be afforded duty free treatment under the
Nairobi Protocol if the requirements of HTSUS subheading 9817.00.96 are met, regardless of
whether the merchandise is also classifiable under provisions in other chapters.  See id.

## II.    Analysis of the Terms Under HTSUS 9817.00.96

The court must first ascertain the proper meaning and scope of the terms under HTSUS

subheading 9817.00.96 before determining whether Plaintiff's compression products are

classified under that provision.  See Schlumberger Tech. Corp., 845 F.3d at 1162 (citing Sigma-

Tau HealthScience, Inc., 838 F.3d at 1276).

Congress passed the Educational, Scientific, and Cultural Materials Importation Act of

1982[8] and the Omnibus Trade and Competitiveness Act[9] to implement the Nairobi Protocol.

This legislation eliminated duties for a variety of merchandise, including products covered by

HTSUS subheading 9817.00.96:

> 9817    Articles specially designed or adapted for the use or benefit of the blind or
> other physically or mentally handicapped persons; parts and accessories
> (except parts and accessories of braces and artificial limb prosthetics) that
> are specially designed or adapted for use in the foregoing articles:
>
> . . .
>
> 9817.00.96        Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Free

Subheading 9817.00.96, HTSUS.  Classification under this provision depends on whether the

merchandise is "specially designed or adapted for the use or benefit of the blind or other

mentally or physically handicapped persons."

The relevant subchapter note to Chapter 98 provides that the term "'physically or

mentally handicapped persons' includes any person suffering from a permanent or chronic

physical or mental impairment which substantially limits one or more major life activities, such

---

[8] See Pub. L. No. 97-446, 96 Stat. 2329, 2346 (1983).
[9] See Pub. L. No. 100-418, 102 Stat. 1107 (1988).

as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing,

learning, or working." U.S. Note 4(a), Subchapter XVII, Chapter 98, HTSUS. This non-

exhaustive list of activities indicates that the definition of handicapped persons should be

interpreted liberally and encompasses a wide range of conditions, as long as the condition

substantially inhibits a person's ability to perform essential daily tasks. Customs has also

acknowledged that, "with the inclusion of activities such as breathing, this [definition of

handicapped] is intended to cover a broad range of individuals." U.S. Customs Service

Implementation of the Duty-Free Provisions of the Nairobi Protocol, Annex E, to the Florence

Agreement, T.D. 92-77, 26 Cust. Bull. & Dec. 240, 246 (1992) (interpretive rule) ("Customs

Implementation"). Neither the HTSUS nor the subchapter note clarify precisely what is

considered a 'substantial limitation.' The inclusion of the word "substantially" denotes that the

limitation must be "considerable in amount" or "to a large degree." See Webster's Third New

International Dictionary 2280 (unabr. 2002).

The subchapter note specifies that the subheading does not cover "(i) articles for acute or

transient disability; (ii) spectacles, dentures, and cosmetic articles for individuals not

substantially disabled; (iii) therapeutic and diagnostic articles; or (iv) medicine or drugs." U.S.

Note 4(b), Subchapter XVII, Chapter 98, HTSUS. Consideration of the definition for

handicapped persons together with the exclusions in the subchapter note provides further insight

regarding the bounds of what is considered a physical handicap under this subheading. The

impairment must be permanent[10] as opposed to transient,[11] and chronic[12] as opposed to acute.[13] The article cannot be designed to impart a cosmetic[14] benefit to those who are not substantially disabled.  The subheading does not cover therapeutic articles,[15] which have been defined as "having healing or curative powers."  See Richards Med. Co. v. United States, 13 CIT 519, 520–21, 720 F. Supp. 998, 1000 (1989), aff'd, 910 F.2d 828, 830–31 (Fed. Cir. 1990).[16]  Nor does the provision cover diagnostic articles,[17] which have been defined as articles that "assist a health professional to detect the signs and symptoms of a condition or disease."  Trumpf Med. Sys., Inc.

---

[10] Permanent is defined as "continuing or enduring (as in the same state, status, place) without fundamental or marked change."  See Webster's Third New International Dictionary 1683 (unabr. 2002).

[11] Transient is defined as "passing away in time or ceasing to exist" and is synonymous with "impermanent," "short-lived," and "ephemeral."  See Webster's Third New International Dictionary 2428 (unabr. 2002).

[12] Chronic is defined as "suffering from a disease or ailment of long duration or frequent recurrence" or "marked by long duration, by frequent recurrence over a long time, and often by slowly progressing seriousness."  See Webster's Third New International Dictionary 402 (unabr. 2002).

[13] Acute is defined as "having a sudden onset, sharp rise, and short course."  See Webster's Third New International Dictionary 23 (unabr. 2002).

[14] Cosmetic is defined as "relating to or making for beauty" and is synonymous with "beautifying."  See Webster's Third New International Dictionary 514 (unabr. 2002).

[15] Therapeutic is defined as "of or relating to the treatment of disease or disorders by remedial agents or methods."  See Webster's Third New International Dictionary 2372 (unabr. 2002).

[16] The court recognizes that Richards Med. Co. was decided under the Tariff Schedules of the United States, the predecessor to the HTSUS, but does not view this as a reason to depart from the definition of the term "therapeutic" used in that case.

[17] Diagnostic is defined as "serving to distinguish, identify, or determine [a] characteristic of or . . . the presence of a particular disease."  See Webster's Third New International Dictionary 622 (unabr. 2002).

v. United States, 34 CIT 1404, 1417, 753 F. Supp. 2d 1297, 1308 (2010) (internal quotations omitted).

The HTSUS does not offer any guidance for determining whether an article is "specially designed" for handicapped persons.  In the absence of a clear definition under the HTSUS, the court may consult dictionaries, scientific authorities, and other reliable information sources.  See Kahrs Int'l, Inc. v. United States, 713 F.3d 640, 644 (Fed. Cir. 2013) (citing Mead Corp. v. United States, 283 F.3d 1342, 1346 (Fed. Cir. 2002)).  The term "specially" is synonymous with "particularly," which is defined as "to an extent greater than in other cases or towards others." Webster's Third New International Dictionary 1647, 2186 (unabr. 2002).  The dictionary definition for "designed" is something that is "done, performed, or made with purpose and intent often despite an appearance of being accidental, spontaneous, or natural."  Webster's Third New International Dictionary 612 (unabr. 2002).  According to these definitions, articles specially designed for handicapped persons must be made with the specific purpose and intent to be used by or benefit handicapped persons rather than the general public.  Cf. Marubeni Am. Corp., 35 F.3d at 534 (construing a provision with similar language that covered "motor vehicles principally designed for the transport of persons").

Additionally, it is helpful to note that Customs has considered a number of factors to determine whether a particular product is "specially designed or adapted" for handicapped persons, including the physical properties of the merchandise, whether the merchandise is solely used by the handicapped, the specific design of the merchandise, the likelihood the merchandise is useful to the general public, and whether the merchandise is sold in specialty stores.  See Customs Implementation at 242–45.  Customs has weighed these factors on a case-by-case basis

to determine whether merchandise is specially designed for the handicapped.  See id. at 245.

The Parties rely on a number of these factors in arguing whether Plaintiff's compression products

are "specially designed or adapted" for handicapped persons.  The court also considers these

factors useful in analyzing whether Plaintiff's compression products meet the requirements of the

Nairobi Protocol and HTSUS subheading 9817.00.96.

**III.    Classification of Plaintiff's Graduated Compression Products**

After the court ascertains the proper meaning of the terms in the tariff provision, the court

must determine next whether Plaintiff's compression products fall within the parameters of the

tariff provision.  See Schlumberger Tech. Corp., 845 F.3d at 1162 (citing Sigma-Tau

HealthScience, Inc., 838 F.3d at 1276).  To prevail on its classification claims, Plaintiff must

show that there is no genuine issue of material fact that its compression products are specially

designed for the use of persons who have a physical handicap as defined by the Nairobi Protocol

and implemented under HTSUS 9817.00.96.

**A.  Graduated Compression Hosiery (Series 120, 145, 185)**

**i.    Nairobi Protocol and HTSUS 9817.00.96**

Plaintiff contends that its graduated compression hosiery models are duty free under the

Nairobi Protocol because they are specially designed for the use of individuals who suffer from

the condition of CVD.  See Pl. Br. 5–21.

As a matter of law, the court must determine first whether CVD constitutes a physical

handicap under the tariff provision.  A physical handicap is a permanent physical impairment

that substantially limits one or more major life activities such as walking or working.  See U.S.

Note 4(a), Subchapter XVII, Chapter 98, HTSUS.  The court notes that the parties are in

agreement that CVD is a mechanical problem of the lower limbs that results in a deficiency in the flow of blood due to weak, damaged, or otherwise compromised veins. <u>See</u> Def. Facts ¶ 9; Pl. Facts Resp. ¶ 9. It is undisputed that the condition is incurable and worsens over time, especially when left untreated. <u>See</u> Def. Facts ¶ 10; Pl. Facts Resp. ¶ 10. The CEAP scale is used to categorize the symptoms and the severity of CVD and its progressive stages. <u>See</u> Def. Facts ¶ 11; Pl. Facts Resp. ¶ 11. The symptoms experienced by people suffering from the early stages of CVD (CEAP grades C0–C2) include varicose veins as well as tired, heavy, and achy legs. <u>See</u> Def. Facts ¶¶ 11, 14–15; Pl. Facts ¶¶ 11, 14–15. A quarter of American adults have varicose veins, and many of those individuals do not suffer any discomfort or symptoms of CVD. <u>See</u> Def. Facts ¶ 20; Pl. Facts Resp. ¶ 20. People who suffer from symptoms associated with the more severe cases of CVD (CEAP grades C3–C6) (referred to as CVI) also experience swelling, skin damage, open wounds, or ulcers. <u>See</u> Def. Facts ¶ 12; Pl. Facts Resp. ¶ 12. The symptoms experienced in the early stages of CVD do not render a person physically handicapped within the meaning of HTSUS subheading 9817.00.96.

Although Plaintiff argues that even the early stages of CVD significantly limit a person's ability to walk, stand, or work, <u>see</u> Pl. Br. 5–10, Plaintiff's own expert provided contrary deposition testimony establishing that people who suffer from early stages of CVD symptoms under CEAP grades C0–C2 are ambulatory and are generally able to perform daily tasks without substantial limitation. <u>See</u> Def. Ex. E at 55, 73–74, Mar. 10, 2016, ECF No. 61-5 ("Dr. Labropoulos Dep."). These CVD patients may have varicose veins or tired, achy legs with some discomfort, but they are not prevented or considerably limited from walking, standing, or

working.  In a motion for summary judgment, "a party cannot rest upon mere allegations or

denials and must point to sufficient supporting evidence."  See Anderson, 477 U.S. at 248–49.

   The court considered numerous sources in ascertaining the proper meaning of the terms

in the tariff provision, including the tariff heading, subchapter notes, dictionary definitions, the

Parties' submissions, documents and deposition transcripts in the record, and relevant case law.

In the court's view, individuals suffering from early stages of CVD are not substantially limited

in their ability to perform major life activities and are not considered physically handicapped

under the tariff provision.[18]

   The court must determine next whether Plaintiff's compression hosiery is specially

designed for the use of physically handicapped persons.  The court considered a number of

factors in making this determination, including the physical properties of the merchandise,

whether the merchandise is solely used by the handicapped, the likelihood the merchandise is

useful to the general public, whether the merchandise is sold in specialty stores, and the specific

design of the merchandise.  The products are made of synthetic fibers and appear to be ordinary

hosiery and socks.  See Def. Facts ¶ 6–7; Pl. Facts Resp. ¶ 6–7; see also Ex. A at 000029–30,

000035.  Plaintiff agrees that the hosiery is used by patients who suffer from CVD symptoms

under CEAP grades C0–C2, indicating that the hosiery is useful to the general public and is not

used solely by the physically handicapped.  See Def. Facts ¶ 15; Pl. Facts Resp. ¶ 15.  The

models of compression hosiery are sold in medical supply stores and at pharmacies, but are also

---

[18] The court does not need to determine whether the more severe symptoms of CVD (i.e., CVI) are a physical handicap because, as explained later in the opinion, the undisputed facts and evidence before the court establish that the subject hosiery is specially designed to alleviate the symptoms of CVD in its early stages and to slow the progression of the condition.

sold over-the-counter or over the internet with no prescription required and are generally not covered by insurance.  See Def. Facts ¶ 18; Pl. Facts Resp. ¶ 18.  The hosiery is not sold under Plaintiff's "Medical" line of compression products.  See Def. Facts ¶¶ 2, 8, 19; Pl. Facts Resp. ¶¶ 2, 8, 19.  All of the hosiery models are designed to apply 15–20 mmHg of compression to force blood out of the extremity and attempt to restore normal venous activity.  See Pl. Facts ¶¶ 11, 13; Def. Facts Resp. ¶¶ 11, 13.  The 15–20 mmHg of compression applied by the hosiery is lower than the 30-40 mmHg or higher compression levels of Plaintiff's "Medical" line products, and 15–20 mmHg is the lowest level of compression products sold by Plaintiff.  See Def. Facts ¶¶ 6–8; Pl. Facts Resp. ¶¶ 6–8; see also Ex. A at 000025, 000029–30, 000035, 000268.  The undisputed facts establish that Plaintiff's compression hosiery is not specially designed for the handicapped.

Despite Plaintiff's contentions that its compression hosiery products are intended to alleviate the symptoms for CVI under CEAP grades C3–C6, see Pl. Br. 19–21, Plaintiff's own advertising materials confirm that compression garments that exert compression of 15–20 mmHg are for (1) heavy, fatigued, tired legs; (2) prophylaxis during pregnancy; (3) prophylaxis for legs predisposed to risk; and (4) long hours of standing or sitting.  See Ex. A. at 000268.  Plaintiff's advertising materials also state that graduated compression therapy is not recommended or suitable for bedridden or non-ambulatory patients.  See id. at 000269.  This information indicates that the hosiery is recommended for patients suffering from early stages of CVD, not for patients who are bedridden or immobilized.  Plaintiff's medical expert noted that the level of 15–20 mmHg of compression is only slightly greater than ordinary socks, which can apply about 5 mmHg of compression.  See Dr. Labropoulos Dep. at 104.  Plaintiff's experts indicated that the

target consumers for hosiery with 15–20 mmHg of compression are "people who have a

profession or live a lifestyle that results in tired, achy, heavy feeling in their legs" and "people

who are sitting for prolonged periods of time," such as people who take long flights in an

airplane or drive long distances.  See Def. Ex. C at 13, 18–19, Mar. 10, 2016, ECF No. 61-3

("Brannan Dep."); see also Def. Ex. D at 21, Mar. 10, 2016, ECF No. 61-4.  Mere allegations are

insufficient to raise a genuine issue of a material fact on summary judgment, and Plaintiff's own

evidence supports the conclusion that its compression hosiery products are not specially designed

for handicapped persons.

Plaintiff attempts to argue that a patient might use 15–20 mmHg compression hosiery to

alleviate severe symptoms of CVI in certain instances when the person cannot tolerate higher

levels of compression or has too much difficulty putting on hosiery with greater compression.

See Pl. Br. 20–21 (citing Joint Expert Report Ex. 1 at 163; Brannan Dep. 29, 31–33, 60; Dr.

Labropoulos Dep. 16, 24–25, 106–07).  Plaintiff's argument is without merit.  The court's

inquiry must focus on whether the product at issue is specially designed for handicapped persons

according to the statutory meaning, not whether there is incidental use of the product that could

assist handicapped persons in limited circumstances.

The court holds that Plaintiff's 15–20 mmHg compression hosiery products are specially

designed to address symptoms of early stages of CVD, which does not fall within the parameters

of the tariff provision because individuals suffering from early stages of CVD are not physically

handicapped.  The models of compression hosiery at issue in this case are not classifiable under

HTSUS subheading 9817.00.96 and are not entitled to duty free treatment.  Therefore, the court

denies Plaintiff's motion for summary judgment seeking classification of its compression hosiery

under HTSUS subheading 9817.00.96.

> **ii.    HTSUS 6115.10.40**

Defendant argues in its cross-motion for summary judgment that the models of

compression hosiery are classifiable under HTSUS subheading 6115.10.40, which covers the

following merchandise:

> 6115    Panty hose, tights, stockings, socks and other hosiery, including graduated
> compression hosiery (for example, stockings for varicose veins) and
> footwear without applied soles, knitted or crocheted:
>
> > 6115.10    Graduated compression hosiery (for example, stockings for
> > varicose veins):
> >
> > . . .
> >
> > Other graduated compression hosiery
> >
> > . . .
>
> 6115.10.40     Of synthetic fibers (632) . . . . . . . . . . . . . . . . . . . . . . 14.6%

Subheading 6115.10.40, HTSUS.  The court agrees that the hosiery is properly classified under

this provision.

The Explanatory Note to HTSUS subheading 6115.10 defines "graduated compression

hosiery" as "hosiery in which the compression is greatest at the ankle and reduces gradually

along its length up the leg, so that blood flow is encouraged."  Explanatory Note to Subheading

6115.10, HTSUS.  There is no dispute as to whether the hosiery imparts 15–20 mmHg of

graduated compression.  <u>See</u> Pl. Facts ¶ 6; Def. Facts Resp. ¶ 6; Def. Facts ¶¶ 3–4; Pl. Facts

Resp. ¶¶ 3–4.  Nor is there any dispute that the hosiery is knitted.  <u>See</u> Pl. Facts ¶ 7; Def. Facts

Resp. ¶ 7.  The hosiery is made of nylon, spandex, or silicone, which are synthetic fibers.  See

Def. Facts ¶¶ 6–7; Pl. Facts Resp. ¶¶ 6–7.  The court holds that the graduated compression

hosiery are classifiable under HTSUS subheading 6115.10.40.[19]  The court grants Defendant's

cross-motion for summary judgment, therefore, seeking classification of the compression hosiery

under HTSUS subheading 6115.10.40.

### B.  Graduated Compression Arm-Sleeves and Gauntlets (Series 500)

#### i.    Nairobi Protocol and HTSUS 9817.00.96

Plaintiff contends that its Series 500 graduated compression arm-sleeves and gauntlets

are duty free under the Nairobi Protocol because the products are specially designed for the use

of individuals who suffer from upper-limb lymphedema.  See Pl. Br. 5–21.

The court must determine first whether upper-limb lymphedema constitutes a physical

handicap under HTSUS subheading 9817.00.96.  A physical handicap is a permanent or chronic

physical impairment that substantially limits one or more major life activities, such as caring for

one's self, performing manual tasks, or working.  See U.S. Note 4(a), Subchapter XVII, Chapter

98, HTSUS.  The Parties agree that lymphedema is "a chronic and incurable condition in which

the patient's lymphatic system does not function efficiently to recirculate lymph out of the

---

[19] Customs classified a number of Plaintiff's compression hosiery products as entered under
HTSUS subheading 6115.10.05, a duty free provision.  See Pl. Facts ¶ 3; Def. Facts Resp. ¶ 3;
see also Summons.  Neither Plaintiff nor Defendant contend that the hosiery products are
classifiable under this tariff provision, but the court must determine "whether the government's
classification [was] correct."  Jarvis Clark Co., 733 F.2d at 878.  HTSUS subheading 6115.10.05
covers "[s]urgical panty home [sic] and surgical stockings with graduated compression for
orthopedic treatment."  The court notes that the government's classification of Plaintiff's hosiery
products under HTSUS subheading 6115.10.05 was incorrect because the products are not
designed or intended for use as surgical compression stockings for orthopedic treatment.  See
Def. Facts ¶¶ 24–25; Pl. Facts Resp. ¶¶ 24–25.

extremities." Pl. Facts ¶ 14; Def. Facts Resp. ¶ 14.  An improperly functioning lymphatic system

causes lymphatic fluid and water to pool in the extremities, causing pain, swelling, sluggishness,

and skin ulcerations.  See Pl. Facts ¶¶ 14, 23; Def. Facts Resp. ¶¶ 14, 23; see also Def. Facts

¶ 21; Pl. Facts Resp. ¶ 21.  Those with "improperly functioning lymphatic systems suffer from

extremely swollen limbs due to retained lymphatic fluid." See Pl. Facts ¶ 23; Def. Facts Resp.

¶ 23.  Lymphedema can interfere with and impair certain life functions.  See Pl. Facts ¶ 20; Def.

Facts Resp. ¶ 20.  Women who have had their lymph nodes damaged or surgically removed

during a mastectomy to treat breast cancer suffer from upper-limb lymphedema.  See Def. Facts

¶ 21; Pl. Facts Resp. ¶ 21; see also Pl. Facts ¶ 23; Def. Facts Resp. ¶ 23.  In some cases, people

who suffer from upper-limb lymphedema may be unable to use the affected arm because of

significant swelling.  See Def. Facts ¶ 23; Pl. Facts Resp. ¶ 23.  According to the undisputed

facts, the symptoms of upper-limb lymphedema can render a person physically handicapped

within the meaning of HTSUS subheading 9817.00.96.

The court does not give credible weight to the Government's assertion that a person with

one arm is able to perform life's major activities without substantial limitation.  See Def. Br. 20–

21.  Nor does the court agree with the Government's position that upper-limb lymphedema is not

a physical handicap because only patients with severe cases of lymphedema are unable to use the

affected arm.  See id. at 20.  For purposes of tariff classification under the Nairobi Protocol, it is

sufficient that the condition of lymphedema physically impairs some persons to such a degree

that their ability to care for themselves or perform manual tasks is substantially limited.

The court considered numerous sources in ascertaining the proper meaning of the terms

in the tariff provision, including the tariff heading, subchapter notes, dictionary definitions, the

Parties' submissions, documents in the record, and relevant case law.  The court concludes that

upper-limb lymphedema resulting from a mastectomy may render the affected arm unusable

because of significant swelling and substantially limits a person's ability to care for one's self.

The court holds, therefore, that upper-limb lymphedema is a physical handicap within the

meaning of HTSUS subheading 9817.00.96.

      The court must determine next whether Plaintiff's compression arm-sleeves and gauntlets

are specially designed for the use of physically handicapped persons.  To make this

determination, the court considered the physical properties of the merchandise, whether it is

solely used by the handicapped, the likelihood the product is useful to the general public,

whether it is sold in specialty stores, and the specific design.  The undisputed facts establish that

the Series 500 arm-sleeves and gauntlets are specially designed for handicapped persons within

the meaning of the tariff statute.  Unlike the hosiery products discussed above, the graduated

compression arm-sleeves and gauntlets do not resemble any garments that are ordinarily worn by

the general public.  "Graduated compression forces blood and fluids (water, lymph) that have

pooled in the extremity due to malfunctioning or damaged venous valves or lymphatic systems to

circulate out of the extremity."  Pl. Facts ¶ 11; Def. Facts Resp. ¶ 11.  "Forcing blood and other

fluids upward, out of the extremity, prevents venous reflux or pooling, which causes . . . varicose

veins, edema, and skin ulcerations."  Pl. Facts ¶ 13; Def. Facts Resp. ¶ 13.  The arm-sleeves and

gauntlets are designed to apply 30–40 mmHg of graduated compression to reduce swelling and

force pooled lymph fluid to circulate out of the extremity.  See Def. Facts ¶ 21; Pl. Facts Resp.

¶ 21; Pl. Facts ¶ 11; Def. Facts Resp. ¶ 11.  The compression arm-sleeves and gauntlets are

"predominantly worn" by women who suffer from upper-limb lymphedema, which has been

caused by damaged or surgically removed lymph nodes during a mastectomy to treat breast

cancer.  See Def. Facts ¶ 21; Pl. Facts Resp. ¶ 21; Pl. Facts ¶ 23; Def. Facts Resp. ¶ 23; see also

Brannan Dep. at 10, 51; Ex. A at 000025, 000268.  Mastectomy patients "with improperly

functioning lymphatic systems suffer from extremely swollen limbs due to retained lymphatic

fluid."  Pl. Facts ¶ 23; Def. Facts Resp. ¶ 23.  The arm-sleeves reduce swelling in the arm and the

gauntlets reduce swelling in the hand.  Def. Facts ¶ 21; Pl. Facts Resp. ¶ 21.  The arm-sleeves

and gauntlets are prescribed as a preventative measure for people who are expected to suffer

from upper-limb lymphedema or as treatment for people who already suffer from upper-limb

lymphedema.  See Def. Facts ¶ 22; Pl. Facts Resp. ¶ 22; Pl. Facts ¶¶ 8, 17; Def. Facts Resp. ¶¶ 8,

17.  The Parties agree that the graduated compression arm-sleeves and gauntlets can alleviate the

symptoms of upper-limb lymphedema.  Def. Facts Resp. ¶ 21; Pl. Facts ¶ 21.

        The Government argues that the graduated compression arm-sleeves and gauntlets do not

qualify for duty free treatment under the Nairobi Protocol because these are articles for a

transient disability, which are expressly excluded from classification under the provision.  See

Def. Br. 17–21.  The Government contends that the arm-sleeves and gauntlets are transient

articles when they are prescribed for people who suffer from intermittent conditions or by

patients after undergoing surgery.  See id. at 21.  The Parties agree, however, that the arm-

sleeves and gauntlets are predominantly worn by women who have had their lymph nodes

damaged or removed following a mastectomy to treat breast cancer, which results in

lymphedema.  See Def. Facts ¶ 21; Pl. Facts Resp. ¶ 21.  Despite any incidental use by patients

with transient disabilities, the arm-sleeves and gauntlets are primarily marketed and used for

long-term management of lymphedema, not short-term post-surgical use.  The undisputed

evidence demonstrates that Plaintiff's compression arm-sleeves and gauntlets are prescribed by doctors, and are specifically designed and marketed for individuals who are physically handicapped by upper-limb lymphedema resulting from a mastectomy.

For these reasons, the court concludes that Plaintiff's compression arm-sleeves and gauntlets are specially designed for the use of women who are rendered physically handicapped due to upper-limb lymphedema following a mastectomy.  The court holds that Plaintiff's Series 500 graduated compression arm-sleeves and gauntlets are classifiable under HTSUS subheading 9817.00.96 and are duty free as articles specially designed for handicapped persons. Accordingly, the court grants Plaintiff's motion for summary judgment seeking classification of its compression arm-sleeves and gauntlets under HTSUS subheading 9817.00.96.

### ii.    **HTSUS 6307.90.98 and 6116.93.88**

Defendant argues that the graduated compression arm-sleeves and gauntlets are classifiable under HTSUS 6307.90.98 and 6116.93.88, respectively.  <u>See</u> Def. Br. 9–10.  As explained above, Plaintiff's imported Series 500 models of graduated compression arm-sleeves and gauntlets are classifiable under HTSUS subheading 9817.00.96 as articles specially designed for the use of physically handicapped persons and are entitled to duty free treatment.  Thus, the court denies Defendant's cross-motion for summary judgment seeking classification of the graduated compression arm-sleeves and gauntlets under HTSUS 6307.90.98 and 6116.93.88.

## CONCLUSION

For the foregoing reasons, the court concludes that: (1) Series 120, 145, and 185 models of graduated compression hosiery were properly classified under HTSUS subheading 6115.10.40 dutiable at 14.6% *ad valorem*; and (2) Series 500 graduated compression arm-sleeves and

gauntlets are classifiable under HTSUS subheading 9817.00.96 and entitled to duty free

treatment.

       Judgment will be entered accordingly.


                                                  /s/ Jennifer Choe-Groves

                                                 Jennifer Choe-Groves, Judge

Dated:  May 17, 2017
        New York, New York